Wright *v.* Marsh, Lee & Delavan.

———— • ● •· ———

## WRIGHT *v.* MARSH, LEE & DELAVAN.

By an act of Congress, approved June 30, 1834, the qualified interest held by the half breeds of the Sac and Fox Indians to the half breed tract in Lee county, was converted into an absolute estate.

Records of the territorial district courts of Iowa, not to be considered as foreign in the state courts of Iowa.

The Iowa territorial district courts were not of inferior jurisdiction. They were invested with the same jurisdiction of a federal character as the circuit and district courts of the United States, and also the general common law jurisdiction usually imparted to state courts of record.

If the district court in partition proceedings, was only authorized to act under the special authority conferred by statute, the jurisdiction would be *quoad hoc* limited and inferior.

Courts of equity may exercise general concurrent jurisdiction with courts of law in all partition cases at common law.

The territorial district courts independent of the partition act, had general jurisdiction of partition proceedings both at law and in equity.

Principles of law and equity are united and applied by the partition act of Iowa.

In partition proceedings the jurisdiction of the district court is threefold: 1. Cumulative and special as created by statute. 2. Having full chancery attributes, except as otherwise provided by the act. 3. General common law authority, so far as it could be exercised with the two preceding powers.

The jurisdiction of a court can be taken away only by express words.

Where the petition contained all the allegations necessary to confer jurisdiction, but omits to describe the interest of unknown owners, the defect cannot be collaterally assailed.

The petition for partition, may be verified by the affidavit of an attorney.

Wright *v.* Marsh, Lee & Delavan.

Objection to the sufficiency of publication of notice, cannot be taken advantage of collaterally.

Not necessary to incorporate a copy of notice, or proof of publication, in a record from a court of general jurisdiction; and if not so incorporated, they will be presumed sufficient.

A slight deviation by commissioners, where it is necessary to an equitable partition of the property, is not fatal to the proceedings.

The final judgment of partition, may properly correct any erroneous computation or inaccuracy in the report of the commissioners.

A partition of real property under the statute, is made complete by the judgment without conveyances.

In a court of general jurisdiction, authority will be presumed until the contrary clearly appears.

Where the record of a final judgment shows that the subject matter and the parties were properly before the court, the judgment becomes conclusive and cannot be collaterally impeached.

Since the act of Congress of 1834, the half breed lands in Lee county have been subject to the laws and courts of Iowa, to the same extent as other lands owned by individuals.

No statute can constitutionally derogate a vested right.

## Error to Lee District Court.

*Opinion by* GREENE, J. This was an action of right, commenced in September 1846, by Marsh, Lee & Delavan against Mitchell D. Wright. The land claimed in the declaration, is described as the S. E. quarter of sec. 23, and the W. half of S. W. quarter of sec. 24 in T. 65 N. of R. 5 W., and is a portion of the land known as the "half breed tract" in Lee county.

Declaration and pleas to the merits filed in the form provided by the statute. *Rev. Stat.*, 533. Trial before Hon. Geo. H. Williams and a jury, was commenced June 2d, and on the 10th of the same month a verdict was returned, and a judgment thereon rendered for the plaintiffs below.

On the trial, it appears that the plaintiffs proved the location of the land in dispute as being comprised within the "half breed tract," and that the defendant was in possession of it before and after the commencement of this suit, thereupon all the treaties between the United States, and the Sac and Fox tribe of Indians together with the act of Congress, and the territorial laws in relation to the

cession, transfer and partition of the "half breed tract," were by agreement admitted in evidence subject to all legal objections. The record of a judgment under which said tract was divided among the respective claimants, was also admitted in evidence. The defendant interposed several objections to the admission of this record, and these objections comprise the principal questions of law involved in the trial of this cause. Before entering upon the discussion of these questions, we will refer to the various treaties and laws affecting the land in question, and state the leading features of the partition proceedings.

The half breed tract formerly a portion of the Louisiana purchase, is a reservation of land made by the Sac and Fox tribes of Indians in a treaty concluded with the United States August 4th, 1824, by which those tribes relinquished to the United States all their right, title, interest and claim to the lands which the said Sac and Fox tribes have, or claim, within the limits of the state of Missouri, which are situated, lying and being between the Mississippi and Missouri rivers, and a line running from the Missouri at the entrance of the Kansas river, north one hundred miles to the north west corner of the state of Missouri, from thence east to the Mississippi. It being understood that the small tract of land lying between the rivers Des Moines and Mississippi, and the section of the above line between the Mississippi and the Des Moines is intended for the use of the half breeds belonging to the Sac and Fox nation. They holding it however, by the same title, and in the same manner that other Indian titles are held. 7 U. S. Statutes At Large, 229. The tract of land thus reserved and designated for the use of the Sac and Fox half breeds contains about 119,000 acres. It will be observed that this tract was not in the state of Missouri, and consequently not comprised within the boundaries of land ceded by the above treaty to the United States, and still the reservation contains definite boundaries, and is sufficiently appropriated to the use intended. But as it was not comprehended in the cession to the United States, it

might be assumed that they acquired no other control or jurisdiction over it than they have in other lands possessed and retained by Indian tribes, and that the Sacs and Foxes held a reversionary interest in the tract upon the extinction of their half breeds. This state of things, however, did not long continue, for by another treaty concluded at Fort Armstrong, in Sept. 1832, the said half breed tract was included in the cession of lands then made by those tribes to the United States. 7 U. S. Statutes At Large, 374. Hence it must be concluded that by the treaty of 1824, the Sac and Fox half breeds acquired a right of property, and possession in the reserved tract of land, under the limitation that they should hold " by the same title and in the same manner as other Indian lands are held," and by the treaty of 1832 the cession made by those two tribes released to the United States their reversionary interest, and with it every vestige of their authority and control over the land. By an act of Congress approved June 30th, 1834, the qualified interest held by the half breeds in the land in question, was converted into an absolute estate in fee. This act relinquished and vested in said half breeds " all the right, title and interest which might accrue or revert to the United States, to the reservation of land," describing it as reserved by treaty of 1824, and then the act proceeds to vest them " with full power and authority to transfer their portions thereof by sale, devise or descent according to the laws of Missouri." 4 U. S. Stat. at Large, 741 chap. 167.

The half breeds availing themselves of the right, fee and alienation thus acquired, transferred their interest to a large extent to other individuals.

On the 14th of April, 1840, Josiah Spalding and twenty-two others filed a petition in the district court of Lee county for a partition of the tract among the respective owners. The petition named Euphrosine Antaya and several others as defendants. The petitioners set forth that they have a legal title to, and are seized in fee of twenty-three and one third full shares, and 5135 acres of land in

12

that tract commonly called the "*half breed tract.*" The petition then describes the situation and boundaries of the tract alleging that it contains "119,000 acres more or less." The particular claim or share of each petitioner with the name of the person or persons from whom derived, is defined in the petition, and in referring to the interest of the defendants named in the petition it avers, that they, their heirs and assigns, and other persons, whose names and places of residence are unknown to your petitioners, are tenants in common with your petitioners in said premises. To this petition is appended the affidavit of one of the attorneys for the plaintiffs that the facts therein set forth are true, to the best of his knowledge and belief. A writ of summons was issued and returned that the defendants therein named were "not found," and thereupon at the April term of the district court an order of publication was made. At the October term following, a record entry appears in these words: "On this day came the petitioners by Reid and Johnston, their attorneys, and made proof of the publication of the notice ordered to be made at the April term, 1840." This notice sets forth "that a petition was filed on &c., by &c., against &c., and is now pending wherein the petitioners pray that partition may be made of the following real estate (describing it,) and the said defendants and all other persons interested in the said property are requested to appear and answer said petition on &c., or the proceedings had in the cause thereof, will be binding and conclusive on them forever." Attached to a copy of the notice is the affidavit of John H. McKinney then publisher of the Iowa Territorial Gazette, in which he swore that the notice had been published in that paper for twelve consecutive weeks, &c. At the said October term, additional parties were on application admitted as plaintiffs to the petition; and several persons made their appearance as defendants, and time was given them to file their answers. At the April term 1841, all the defendants named and not named in the petition, appeared and answered except Euphrosine Antaya, and in their answers

Wright *v.* Marsh, Lee & Delavan.

set forth their respective titles; and by consent the court tried the cause, and entered a judgment of partition. In setting forth the inducement and the action of the court in the premises, the judgment recites as follows: "In this case said defendants having appeared by their counsel respectively and filed their answers to the petition, stated and produced their respective claims, and exhibited their proofs, in some instances the original conveyances, and in others authentic copies of conveyances by which the same are held and their said respective claims, and those of the petitioners by their counsel respectively, being by consent submitted to the court for adjudication and partition, according to law, and the court being satisfied by sufficient proofs, that the publication required by the act entitled "an act to provide for the partition of real property" has been duly made, and no other persons known or unknown having appeared or made any claim or objection to said partition, and the said claims of the said parties now before the court, petitioners and defendants, and their respective proofs and conveyances being by the court heard and considered, it is therefore by the consideration of the court and with the consent of the said parties, this 8th day of May, A. D. 1841, ordered and adjudged, that the claims of rights of the said parties respectively to the undivided portions of the land mentioned and described in said petition, amount in the whole to one hundred and one equal portions, and that of these Marsh, Lee & Delavan, trustees for the claimants under the articles of association dated Oct. 22d, 1836, filed in this case, and as trustees for persons interested under said articles, are entitled to 41 shares, &c." The judgment then sets forth the undivided portions to which the other defendants and the petitioners were respectively entitled, and ordered that they should be confirmed accordingly, and that partition of the tract should be equally and fairly made, among the parties, petitioners and defendants to the exclusion of all other persons. The judgment designated Samuel B. Ayers, Harmon Booth and Joseph Webster, as commissioners to

make the partition into one hundred and one shares of equal value, and report the same to the court for confirmation. At the October term, 1841, of said court, the commissioners presented their report, dividing the land into shares as they had been directed, excepting certain islands in the Mississippi and Des Moines rivers, which are reported to be so situated that partition could not be made of them without prejudice to the owners, and they therefore recommend that they be sold. By consent of counsel and all the parties concerned, the court then ordered, adjudged and decreed that the report and all things therein contained be ratified and confirmed; also ordered, the allotment of shares to be made by the commissioners with specific directions. The judgment or decree of partition, the report of the commissioners designating particular property under each share as numbered and divided by them, the final judgment of confirmation and the allotment of the various shares to the respective owners are set forth in detail and with clearness on the record. So far as this record discloses the proceedings, they appear to have been conducted with fairness, deliberation and a particular regard to the regulations of the statute. Every important order in the partition appears to have been made by consent of all the parties concerned. The record shows that the land in question is included in that which was set apart by the allotments under the partition to the plaintiffs below, and this constituted the only evidence of their title to the premises. The principal questions raised for adjudication are in relation to the admissibility of this record as evidence. We will proceed to consider the various objections urged to the partition.

1. It is contended that the territorial court which rendered the judgment of partition must be considered under our state organization as a foreign court. As the authentication of the record was not questioned in the court below, this point cannot be entertained as an objection to the record in this particular. But the foreign character of the territorial court is also urged

Wright *v.* Marsh, Lee & Delavan.

to detract from the authenticity and conclusiveness of the record, to remove those presumptions of law which would otherwise apply in its favor. It may well be questioned, whether this would be the effect of the partition record even if it should be considered the adjudication of a foreign court. Such at least could not be the effect if we should be governed by the weight of English authorities. The decisions of the American courts upon this point have been various and conflicting. All agree however, that the record of a decree or judgment would be at least *prima facie* evidence of correctness, and many have affirmed the English doctrine, that it would be conclusive if the adjudication was definitive and made by a court of competent jurisdiction. But the determination of this question is not necessarily involved in the trial of this cause. We can by no means arrive at the conclusion that our territorial court should be regarded as a foreign tribunal, and as a consequence it is unnecessary in this case to decide what would be the effect of a record from a foreign court. We have carefully examined the arguments and authorities which counsel have ingeniously presented, in attempting to show that the district courts of the territory of Iowa should be adjudged as foreign when records emanate from them to the district courts of the state of Iowa, but we can see no good reason in fact or in law, for thus regarding them. In what way could this change in our form of government so completely estrange and alienate our territorial courts? By this change our former courts were not transferred to a foreign soil, nor their records entrusted to foreign hands. No rights which had been acquired, no proceedings which had been perfected or commenced under our territorial courts were relinquished or abated by our assuming state sovereignty. Under the thirteenth article of our state constitution, judicial proceedings, claims and rights are continued as if no change had taken place in the government; the same laws were continued in force until repealed, and even the same officers civil and military are authorized to act until suspended. Independent

of the connecting link existing between our territorial and
state courts *ex necessitate rei,* we find them bound togeth-
er under the same sovereignty by constitutional provision.
So far from having been expatriated by our constitution
and new form of government, it will be observed that our
territorial courts were not at first even suspended, but
were ultimately merged and perpetuated into state courts.
Proceedings commenced in the former were conducted
to final judgment in the latter.   Even the judges and clerks
in the one were continued for a time in the other.   They
were both constituted within the same territorial limits;
appointed to adjudicate within the same venues, upon the
same realty and among the same people; and thus far the
records of the two courts have generally been entered in
the same books.   They are preserved in the same offices;
under the charge and keeping of the same clerks; and are
alike subject to the inspection of our citizens.   Why, then,
should the records of our former courts be regarded as for-
eign by our present courts?   Those of our territorial courts,
except in cases of a strictly federal character or jurisdic-
tion have become the property of the state by appropriate
and legitimate descent.   They are properly retained and
controlled by our state courts, and copies may be authen-
ticated by them for the use of those who may be interest-
ed in them.   In thus concluding that our territorial records
are as much under our state jurisdiction and are as domes-
tic in their character as are those of our state courts, we
have not overlooked the decision of the supreme court of
the United States in *Hunt* v. *Palao,* 4 Howard 589.   This
was a case of federal jurisdiction, cognizable only before
a court of the United States; a case over which no state
could exercise authority or control, and consequently it is
not applicable to the question at bar.   An act of Congress
approved Feb. 22d, 1848, in relation to the records of our
territorial courts, recognizes the transfer of all such re-
cords to the state excepting the records of a federal char-
acter, and even those, the respective clerks are authorized
to retain, and upon application by any person interested

make and certify a full and complete copy of the same to the clerk of the district court of the United States, so far as it can be done without mutilating the records of the territorial courts. See Laws of 30th Con. 1st session, p. 8 § 3. These various considerations, we think clearly establish the domestic character of our territorial courts as predecessors of our state courts. *Beatty* v. *Ross*, 1 Branch 188.

2. It is urged that the district court which rendered the decree was one of inferior and limited jurisdiction. In support of this position, counsel have cited 2 McLean 126; 1 Kent's Com. 303; 2 U. S. Cond. 37, 405; 2 Howard U. S. 21; 6 *ib.* 39. These authorities pertain exclusively to the jurisdiction of the circuit and district courts of the United States, and have no bearing whatever upon the territorial district courts, nor do the authorities cited hold that those United States courts are of inferior jurisdiction. They are limited but not inferior. Their proceedings therefore, are not nullities even if their jurisdiction does not appear of record, and if not reversed for that defect those proceedings are conclusive evidence between parties and privies. *McCormick* v. *Sullivant*, 10 Wheat. 192; *Turner* v. *Bank of N. A.*, 4 Dallas 8; *Reed* v. *Vaughn*, 10 Mis. 447. If then the circuit and district courts of the United States are not of inferior jurisdiction, *a fortiori* the territorial courts are not, for the latter are not only invested with the same extent of jurisdiction as the former in proceedings of a federal character, *Lorimer* v. *State Bank of Ill.*, Morris 223, but also the general common law jurisdiction usually imparted to state courts of record. The 9th section of the Iowa organic law provides that the several courts thereby created, both appellate and original, shall be as limited by law, and that the supreme and district courts respectively shall have a chancery as well as a common law jurisdiction. The territorial district courts, in addition to the federal powers conferred upon them, were invested with extended and general jurisdiction over actions real, personal and mixed. Under this general jurisdiction they were authorized to try and determine ac-

cording to the course of the common law, all ordinary actions both local and transitory. They were also invested with a special jurisdiction conferred by legislative enactment, in proceedings which could not be entertained as actions at common law. The term inferior courts in a strict and technical sense, is only applicable to courts of a limited and special jurisdiction, in which the proceedings are not according to the course of the common law, but defined by statutory regulations. It must be obvious that our territorial district courts cannot be included under that term. They were endowed with all the general powers and universal attributes of common law jurisdiction. Their authority was general and superior to all but the supreme court. Justices of the peace, county commissioners and probate courts were all subordinate and inferior to them. In one sense, in one connection only can they be regarded as inferior tribunals, and that is in relation to the supreme or appellate courts before which their judgments might be taken for revision. Still their powers are general, their jurisdiction in legal contemplation is not limited or inferior. Many authorities in relation to superior and inferior courts may be found collected in 3 Cow & Hill's Notes to Phil. Ev. n. n. 691, 2, 3, 4. But it is contended that if the district court which rendered the decree, did possess general jurisdiction, it acted in the partition proceedings under special authority conferred by statute, and was consequently *quoad hoc*, an inferior or limited court. If in such proceedings the court possessed no authority beyond that conferred by statute, this position could not be controverted. And if the court was thus limited in jurisdiction, it will not be questioned that the course prescribed by the statute ought to have been observed with at least substantial exactness, and every fact necessary to show jurisdiction, ought to appear on the face of the proceedings. Under this view of the case various objections are urged to show that the proceedings were not in accordance with the partition act, and consequently nugatory.

3. As preliminary to these objections it is averred that

the district court, in making the partition, could only act as a court of chancery. This position is assumed in order to show that the proceedings should have been conducted within the limits, and under the regulations, of equity jurisprudence. It may be well to remark upon the powers of the district court, independent of the statutes. The doctrine is now universally conceded, that courts of equity may exercise a general concurrent jurisdiction with courts of law in all partition cases. Nor is equity jurisdiction limited to such cases only as are relievable at law, but in making partition, equity will generally follow the analogies of the law and extend relief in all cases where, by rules of law, it would be regarded as appropriate, and also in many cases where those rules would not furnish a plain, complete and adequate remedy. Mitford's Eq. Pl. 209; 1 Story's Eq. Jur. 646, 658.

At common law the writ of partition may be traced to a very remote period, but the benefits of that writ could only be extended to coparceners, until 31 and 32 Henry VIII. c. c. 1 & 32, by which joint tenants and tenants in common might be required by writ of partition to divide their lands, 2. Black. Com. 185, 194. A jurisdiction thus extended to common law courts, by statutes of so old a date since which, much that is common law has taken its origin, it may well be assumed that common law courts might inherently exercise that extended jurisdiction. This conclusion is necessarily embraced in that advanced by Judge Story and other elementary writers; that in partition proceedings, courts of law have general concurrent jurisdiction with courts of equity. Story's Eq. Jur. 658. And in either court, principles of common law would obtain in testing the title or rights of the respective claimants before entering a decree or judgment of partition. We are of the opinion then that our territorial district courts, independent of the partition act, had general jurisdiction of partition proceedings, both at law and in equity.

The question now recurs, does the statute providing for the partition of real property, *Rev. Stat.* 458, confine cases

13

of partition within the limits of equitable jurisdiction? We are unable to find any clause in that statute which will justify an affirmative answer. It is neither made an action at law nor a proceeding in chancery, but the principles of both are united and applied to the statute regulations. The act provides for a petition and answer, and other proceedings, as in equity. It also provides for a service by summons, for issues of fact and trials by jury, for the rendering of judgments and for writs and assignments of errors, and other proceedings, as at law; §§ 2, 10, 12, 13, 14, 16, 19, 36, 49, 56, 63, 64 and 65. Section 56 provides that the proceedings authorized by the act are intended as a substitute for all partitions in chancery, as well as at law, and the court is authorized to exercise equity powers except as therein otherwise provided. The act generally contemplates the exercise of common law powers. The last four sections of the statute clearly authorize proceedings at law. Section 62 declares " that if the petitioners for any partition become *nonsuit*, or suffer a discontinuance, or a verdict shall pass against them, or judgment shall be rendered against them on demurrer, they shall pay costs, to be recovered and collected as in *personal actions*." The next section provides " that upon any final judgment, rendered pursuant to the provisions of the act, *a writ of error may be brought, &c.*, in the *same manner as in personal actions*." And the last section provides that "judgment may be given by the court above, either for affirmance or reversal in part or in whole, or a new adjudication of the matter may be directed in the court below. The proceedings in other respects shall be the same as in personal actions." Evidently this act does not sustain the point made by counsel, that in making partition the court was confined to chancery jurisdiction. The jurisdiction of the court was threefold: 1. It was invested with all the cumulative and special powers created by the statute. 2. It retained all chancery attributes except as otherwise provided by the act. 3. It retained all its inherent common law authority so far as it could be exer-

cised consistently with the two preceding powers. The three jurisdictions are comprised in and are more or less exercised in all partition suits under that act. The requirements of the statute, so far as they are especially substituted for equity and common law proceedings, are paramount, but beyond such special substitution, law and chancery interpose, with unabated and general concurrent authority. Hence, we conclude that even in cases of partition under our statute, the district court connot be considered *quoad hoc*, as inferior or limited. The doctrine will not be questioned that the general jurisdiction of a court cannot be taken away unless by express words of exclusion. The statute in question has only enlarged and united powers previously existing in the court, and modified the proceedings under those powers, and therefore there is no reason why the same liberal rule should not be applicable to support the presumption that the court acted correctly and by competent authority.

But before deciding upon the admissibility and conclusiveness of the partition record, it may be well to examine the several objections urged to the partition proceedings. One point made is, that the petition does not describe the respective interests of all the joint owners. Nor, if their names were unknown, does it state that fact. In this particular it is true, the petition is not sufficiently specific and certain, but this is far from being a fatal defect, or one which can involve a question of jurisdiction. The petition described the land with certainty, averred that the parties owned it as tenants in common, and prayed for a partition thereof among the respective owners. In a word, the petition contained all the allegations necessary to confer jurisdiction upon the court to act in the premises, but it omits to describe the interest of unknown owners. Such a defect in form might have been good cause for demurrer, and if demurred to, might have been amended to a literal compliance with the statute. But it is by no means a defect which could impeach the proceedings, or be taken advantage of after judgment, much less does it amount to a

defect which can be collaterally assailed. We have carefully examined the authorities cited by counsel upon this point, but we can see nothing in them inimical to our conclusion.

Another objection presented is, that the petition was not verified by such an affidavit as the law requires; all that the statute directs upon this point is, that "the petition shall be verified by affidavit." *Rev. Stat.* 459, § 2. We have already noticed that the petition was verified by the affidavit of one of the attornies. But it is alleged that such an affidavit is not reconcilable with the object and spirit of the statute, that it should have been made by the plaintiffs named in the petition, or at least by some of them. It would be difficult, we think, to apply any rule of construction to the statute which can justify this position. The act does not require, nor can we see any necessity for its requiring, the affidavit to be made by the petitioners themselves. If a petition is verified by affidavit it is strictly conformable to the statute, and it can make no difference whether it is made by a petitioner or by his attorney, or by any other person who may feel himself sufficiently acquainted with the facts averred, to justify him in making the affidavit. But if the affidavit was insufficient the objection comes too late. It was not an element of jurisdiction without which the court could not act. It was merely a formal part of the petition, a preliminary form in commencing the suit, and if objectionable or insufficient the question should have been raised before answers were filed. After answering, it must be considered as waived. Besides, if the affidavit was defectively made, it but amounts to one of those irregularities which could not be collaterally questioned even if the proceedings had taken place before an inferior tribunal. It is next objected that the court acquired no jurisdiction over the unknown owners in consequence of the defective publication. The record, it is true, does not disclose publication to the full extent required by the 9th section of the partition act. That section provides for the publication of notice for twelve weeks

successively in some newspaper printed most convenient to the place where the court was held, and for four successive weeks in some newspaper printed at the seat of government. The twelve weeks publication appears to have been regularly made, but the record is silent as to the other, (*a*) with the exception of a recital in the partition judgment that the petitioners by their counsel made proof of the publication of the notice previously ordered by the court. It appears then that proof of publication was before the court. It was considered, and the publication adjudged to be such as was required by law. It became a decision of that court upon a matter *coram judice* and whether made upon sufficient or insufficient proof, whether the court decided correctly or erroneously as to to the adequacy of the publication, it cannot, in this proceeding, become a subject of inquiry. It was a question which that court alone had the original right to determine, and within its legitimate jurisdiction did decide that the publication was sufficient. If erroneous, the party affected by it had his remedy; he could have had the decision revised and corrected on writ of error, and upon that writ only was the question subject to re-examination.

As the record comes from a court of general jurisdiction it did not become necessary to incorporate into it a copy of the notice or the proof of publication. Without these, the record would have been sufficiently authentic and conclusive. The authority of the court over the subject matter and over the parties, and the correctness of the proceedings would have been favored by all the force of legal presumption.

Objections are also urged to the proceedings of the commissioners in neglecting to follow the order under which they were appointed and the judgment of partition. But

(*a*) The other notice for four weeks, required by the statute, was published in the Iowa Patriot, and the proof of publication was properly made and filed; but was left out of the transcript by the oversight of the clerk of the district court in making out the copy of the proceedings in the partition suit for the supreme court, in this action of right.

we can see nothing in those deviatious which should invalidate the proceedings, especially as they were indispensable to a just and equitable partition of the property, were made by consent of all parties who had adduced evidence of title before the commissioners, or who were known to be legally interested in the tract, and were fully confirmed by the court.

The final judgment is also assailed as being a departure from the commissioners report.    We can discern no foundation for this objection.   The court corrected an erroneous computation made by the commissioners as to the number of shares, by deducting small portions from three of the defendants by their consent, and by consent of all parties. Without such correction, inaccuracy, injustice and confusion would have resulted from a confirmation of the report; but with it the rights and claims of all were satisfactorily adjusted.   Such a correction cannot be regarded as a departure, as a deviation, or as an unwarranted exercise of judicial powers.

The want of conveyances to the respective proprietors, under the partition, is also presented as a deficiency.   Although this question cannot effect the admissibility of the record, it may be well to determine whether deeds are necessary in a partition of real estate, under the statute.   A partition in equity proceeds upon conveyances to be executed by the parties, or in default by commissioners. *McClay* v. *Bowman*, 1 Littel 248; 1 Story's Eq. Jur. § 652. But a partition at law operates by virtue of the judgment. A final judgment of partition is conclusive evidence of title in the parties to the extent therein designated.   The statute does not authorize a *decree*, but it expressly requires a judgment of partition, and a judgment of confirmation. Section 19, *Rev. Stat.* 461, enacts that " after all the shares and interests shall have been settled in any of the methods aforesaid, *judgment* shall be rendered confirming such shares and interests, and that partition be made accordingly."   Section 35 provides that " upon the report of commissioners being confirmed, judgment shall thereupon be

rendered that such partition be firm and effectual forever;"
and the next sectiòn concludes that the judgment afore-
said shall be binding and conclusive upon all persons
whatsoever.    It is a fact worthy of notice that the word
.decree is not used in the statute to designate any order or
decision to be made by a court in partition proceedings.
Therefore the record before us must be considered that of
a judgment, and as such, is per se·conclusive evidence of
the rights and title therein adjudged without the formality
of conveyances.    We are aware that in our state an order
of partition is usually denominated a " decree" or " decree
of partition" but such designation is not authorized by the
statute nor by the character of the proceedings.    Though in
a measure obtained by the interposition of chancery prac-
tice, it is nevertheless a judgment of partition, and such
should be its style.    Rev. Stat., §§ 62, 63, 64, 65.    We
have thus separately noticed these various objections to
the record of partition, in order to settle the practice in
future analagous cases.    But they might have been col-
lectively and more summarily disposed of on general
principles.    Collaterally such objection can never prove
availing, especially when applied to the record from a court
of general jurisdiction in which power and authority will
be presumed until the contrary clearly appears.    In Shum-
way v. Stillman, 4 Cowen, 294, 296, in an action of debt,
.or a judgment from the common pleas of Massachusetts it
was held "every presumption is in favor of the jurisdic-
tion of the court, the record is prima facie evidence of it,
and will be held conclusive until clearly and explicitly
disproved."    So also in Mills v. Martin, 19 John. 33;
Thomas v. Robinson, 3 Wend. 267; Peacock v. Bell, 1
Saund. 73 et seq.; Wheeler v. Raymond, 8 Cow. 311;
Smith v, Rhoads, 1 Day 168; Granger v. Clarke, 9 Shep.
128; Van Dyke v. Bastedo, 3 Green. 224.

We regard it then as well settled that a want of juris-
diction will not be presumed in a court of general author-
ity, and where the record from such a court is silent or
does not aver all the facts necessary to show that jurisdic-

tion was properly exercised it will still be presumed that the court legally acquired power over the subject matter, and over the parties. That the subject matter of partition was cognizable by the district court has not been controverted, and we think it has been sufficiently demonstrated, that the court has both general and superior original jurisdiction over such proceedings. The sufficiency of the petition in form and substance, and in verification; the adequacy of the publication which the statute declares shall be considered equivalent in all respects to a personal service of the summons, (*Rev. Stat.*, 460, §9;) and the correctness of all other proceedings, in the case to give the court jurisdiction not only *in rem* but also *in personam*, were questions within the exclusive purview of that court; they are solemnly adjudicated, and that judgment in the language of the statute "shall be binding and conclusive upon all persons whatever." *Rev. Stat.*, 462, §36. The correctness of that judgment having never been directly questioned before an appellate court the rights of property resulting from it should be admitted as valid, conclusive and effectual. Every man interested in the property had ample opportunity to appear and assert his rights. The door was open to all, the notice was extended to all, an abundance of time given for all to prove their claims and to controvert the rights of others. In justice to the proceedings it must be observed, that they appear to have been conducted with calmness, with deliberation, and with a commendable regard to the requirements of law and the ends of justice. The parties as owners of the "half breed tract appear from the record to have been represented by counsel with but one exception, and her rights appear to have been protected by the court; and the fact that the judgment was rendered by general consent when the parties were numerous, and their rights greatly conflicting, gives strength to the conclusion that the rights of all were consulted in the partition, and that all things of a defective or erroneous character were waived. If any one was aggrieved by the proceedings he had an opportunity to

move for an arrest, or that they be set aside for any irregularity or neglect to conduct them according to the rules of law; or if the court decided erroneously in any particular, the parties injuriously affected thereby had their remedy. A writ of error from the supreme court might have been sued out within the time wisely limited by law, and under that writ any defective action of the court might have been reversed and corrected. But the time prescribed by law for the motion, and for the writ of error was suffered to pass, and by silent acquiescence, by general tacit consent the judgment has become invulnerable, except for fraud, even against a direct assault upon it, before an appellate forum. If thus removed beyond judicial control, and rendered irreversible in any direct proceeding, manifestly there could be no assailable point in the judgment when collaterally drawn in question. If judgments and decrees could be thus collaterally avoided there would be no certainty, no security in judicial actions. No confidence could be reposed in titles thus acquired, no protection afforded to those who might innocently purchase under them. By the solemn judgment of a competent tribunal a large tract of land might be set apart to legal owners, under them many others acquire title, make valuable and extensive improvements, and after reposing in the quiet enjoyment of their possessions for many years have all their rights to the property involved in doubt or destroyed by an evasive collateral proceeding at law. Under so pernicious a doctrine general distrust and odium would attach to judgment titles. In a collateral proceeding before one court to-day a judgment if merely voidable might be declared a nullity, but to-morrow before some other tribunal be adjudged good and valid, and thus endless disputes and uncertainty, rank injustice and oppression would be encouraged by the tribunals of justice which were instituted to suppress these evils. But fortunately for the rights of citizens and the security of property, such a rule has been but seldom recognized by enlightened courts. There is perhaps no feature in our judi-

14

cial system more worthy of commendation, than that all decisions made by constitutional authority are final, conclusive and effectual forever, unless the injured party directly and properly object to the decision before an appellate power, within the time judiciously limited by law. This doctrine has been fully confirmed and its correctness most forcibly illustrated by the highest American courts, *Voorhees* v. *Bank of U. S.*, 10 Peters 449. The leading principles decided in this case were based upon long established and even elementary rules of common law, and were made conformable to many previous decisions by the same exalted tribunal. In *Kempe's Lessee* v. *Kennedy*, 5 Cranch 173, 187, the doctrine emanates from the supreme court by chief justice Marshall, that the inferior court of common pleas for a county in New Jersey possessed general jurisdiction, and although its judgment was erroneous, it was not void. In *Stillman* v. *May*, 6 Cranch 267, the record before the court did not contain the requisite averments of jurisdiction, but it was still held obligatory as a decree. In *Williams* v. *Ameroyd*, 7 Cranch 424, 434, chief justice Marshall says, "that the sentence is avowedly made under a decree subversive of the law of nations, will not help the appellant's case in a court which cannot revise, correct, or even examine that sentence." If an erroneous judgment binds the property on which it acts, it will not bind that property the less because its error is apparent; of that error advantage can be taken only in a court which is capable of correcting it. The above cases in Cranch, are reviewed in *Ex parte Watkins*, 3 Peters 193, and fully confirmed, and in a more recent case the same principles were elaborately discussed, and reaffirmed in an able opinion by Judge Baldwin whose wisdom and correctness in all jurisdictional questions is universally conceded; *Grignon* v. *Astor*, 2 How.. U. S. 319. By applying to the record in the case at bar the principles so clearly settled and deliberately determined by the supreme court of the United States, its admissibility cannot be doubted. It discloses more than is essential for a record from a court

of general jurisdiction. It was enough for the record to show the subject matter and the parties before the court the exercise of judicial power, in relation to them, and a final judgment. If no appeal is taken, or writ of error sued out within the limitation prescribed by statute, that judgment becomes conclusive. The record of it is absolute and incontrovertible verity, and the judgment having been rendered by a court of competent jurisdiction over the subject matter, can be impeached only by showing fraud. In short, no other than an appellate power can inspect the proceedings behind the judgment. And these principles are especially settled in their application to courts of record which possess an original general jurisdiction, the power to hear and determine causes generally. Such a court possesses within itself as a part of its organization, the power to decide all presented questions of jurisdiction within its authority, and to exercise that jurisdiction to a final judgment, which becomes conclusive of all matters decided upon within its jurisdiction, without setting forth in the proceedings, the facts, circumstances or evidence upon which the cause was determined. 2 How. U. S. 340, 341. Apply these comprehensive and well settled principles to the partition record in this case, and all doubt as to its verity, conclusiveness and admissibility must be removed. The case of *Denning* v. *Corwin*, 11 Wen. 647, does not, it is true, altogether harmonize with this conclusion and with what must be regarded as the well established doctrine, at this day even in the New York courts.

But if that case is not virtually overruled we could give it no force as authority to the question at bar. It was made upon a different statute and upon a different state of facts. An affidavit that the owners were unknown, was required before an order of publication, but the record was silent as to the affidavit and publication. In this state no such affidavit preliminary to an order of publication is required, and the record before us is by no means silent as to publication. In that case no proof of publication

appeared of record; in this the record sets forth the proofs and publication, but they are alleged to be insufficient and defective, consequently they could be regarded even in New York only as error, as voidable but not void; 8 Cow. 370. *Denning* v. *Corwin* appears to have been decided on the ground of limited jurisdiction, but even on that ground, the case seems to have lost force and authority in subsequent decisions. In *Foot* v. *Stevens*, 17 Wend. 483, the principle prevailed that parties against whom judgment was rendered, shall be presumed to have been regularly before the court unless the contrary expressly appears, and in *Hart* v. *Seixas*, 21 Wend. 40, the court questioned *Denning* v. *Corwin*, and held that the partition in that case should have been considered voidable only and not void, and in *Bloom* v. *Burdick*, 1 Hill 141, that case is declared to have been overruled so far as the doctrine is asserted that the judgment of a superior court will be void if the record does not show jurisdiction. The proof of notice required in *Denning* v. *Corwin*, is also virtually overruled in *Butler* v. *Mayor of N. Y.*, 1 Hill 489, in which it was held that due notice to the parties of the time and place appointed for the meeting of arbitrators is to be presumed until proved that it was not given. In this case Judge Cowen remarks, "Even that the party has had no notice would be an objection never yet, I apprehend, allowed in such case against the inference arising on the record, though I admit there are *dicta* which countenance its reception." In *Cole* v. *Hall*, 2 Hill 627, we find a case in point. This was an action of ejectment in which the defendant offered the record of a partition judgment against unknown owners who made default, and a partition was awarded. The commissioners reported and set off 358 acres of the land as the plaintiff's half. The report was confirmed, and judgment of partition rendered with an award of twenty-nine dollars and twenty-eight cents costs against the unknown owers, and their respective shares were sold on a *fi. fa.* for that sum to the plaintiff in the partition suit. It was held that in that suit

Wright *v.* Marsh, Lee & Delavan.

the plaintiff's seizin might have been contested, but not in
the collateral proceedings.   And in relation to the other
objections, Judge Cowen in delivering the opinion of the
court said,  "But it was said on the argument that no
proper affidavit was made, nor any notice published, and
that only two of the commissioners met and deliberated.
It would be enough to answer that here was jurisdiction
and a judgment, that such matters of mere irregularity
can not be enquired into collaterally."   And in a case still
more recent from New York, principles are recognized
which show an affirmance of the above doctrine.   It is de-
clared in *Bruen* v. *Hone,* 2 Barb. 596, that a judgment
or decree of a court possessing competent jurisdiction is
final, not only upon matters actually decided, but also upon
matters which the parties to the cause might have had de-
cided.   The court also held that " after a recovery by pro-
cess of law there must be an end of litigation, otherwise
there will be no security for any persons."   And again,
they assert, "it is evidently proper to prescribe some pe-
riod to controversies of this sort, and what period can be
more fit and proper than that which affords a fair and full
opportunity to examine and decide all their claims?"   Sure-
ly a rule so salutary, so indispensable to the protection of
property in the hands of innocent purchasers, so vital to
the stability of courts and the efficient administration of
justice, should not be limited to controversies of any par-
ticular sort; it should be universal in its application.   It
is true that if the proceedings from a court, disclose an
absolute want of jurisdiction over the subject matter or
over the parties, no limitation of time could impart vital-
ity to them.   But a want of jurisdiction cannot be pre-
sumed.   The law presumes that all courts proceed with
authority and correctness.   This presumption applies with
peculiar force, to courts of general jurisdiction, but when
a court proceeds merely in a ministerial  capacity or under
a limited authority, defined and regulated by statute, and
when certain things must appear to have been done, as
preliminary to jurisdiction, or the exercise of powers, such

presumption does not obtain, or at least not to the same extent, and therefore authorities in relation to such ministerial and inferior proceedings can have no bearing upon the present record, and need not be examined.   Under the foregoing principles of law, which we regard as well settled and influenced by the various authorities cited at bar, we are united in the conclusion that the partition record was properly admitted and became conclusive evidence of the legal rights and title of the respective parties as therein designated; and as all persons were made parties to the partition suit, all are estopped by the record in this proceeding.   In arriving at this conclusion, it necessarily follows that we attach no importance to the objection that the half breed tract was Indian land and not subject to the territorial legislation of Iowa.   We think that the statement of facts and the reference to the treaties and laws of Congress contained in this opinion in relation to the lands, are all the arguments necessary to show that they came in a legitimate and conclusive manner under our territorial laws.   Since the act of Congress of 1844, how can the character of these lands be questioned?   They at once acquired all the characteristics, all the advantages and liabilities of individual possessions, they became in law and in fact the property of individual citizens, and not of a tribe or nation of Indians.   They were as subject to the laws of the country and the adjudication of our territorial courts, as any other lands owned by citizens within the territory.   This point was carefully investigated and we think correctly decided by our territorial supreme court in *Reid* v. *Webster*, Morris, 467.   The opinion of the court in that case needs no additional argument to show that the laws of Iowa are properly extended over the half breed tract.

It may also be well to observe that in deciding this case we have attached but little force to the law of 1845, providing "for the better settlement and adjudicating of the several titles set up to the half breed lands in the county of Lee."   So far as that act is remedial in its character it

Wright *v.* Marsh, Lee & Delavan.

should be enforced, but no feature in it can be considered valid and effectual, which would have a tendency to destroy or even impair vested rights. Consequently any record, judgment or decree, which would have been evidence of title in the half breed tract previous to the enactment of that law, cannot by virtue of any thing it contains, detract from the conclusivenes of such evidence since its passage. In short; no statute can constitutionally derogate a vested right. (1)

Judgment affirmed.

*Geo. C. Dixon*, for plaintiff in error.

*J. C. Hall* and *Charles Mason*, for defendants.

(1) The names of the petitioners and defendants in the partition proceedings, and the shares adjudged to each as modified by the final judgment, may be useful to the many who are interested in the "half breed tract." The following, epitomized from the record, shows the names of all the parties, and the interest to which each became entitled under the judgment:

The defendants, Marsh, Lee & Delavan forty-one shares, John Wright one fourth of a share; Cyrus Peck one eighth of a share; Samuel Abbott and Abraham Wendall one half share; William Phelps two shares; Ebenezer D. Ayres one half share; William Gillis one share; Henry McKee one share; Wilson Overall one share; Garrett V. Deniston one half share; James L. Schoolcraft one half share; Elizabeth Hunt one share; Rosella O. Gliem one share; Mary L. Murdock one share; Eliza O. Perkins one share; James L. Burtis one share; Margaret Farrar two shares; James Muir one share; Thomas Connelly one share; John C. Ward one half share; Elijah Fisher, D. W. Kilbourn and Henry S. Austin one share; D. W. Kilbourn and Henry S. Austin one share; Edward Kilbourn one half share; John Burtram one half share; Edwin Manning one quarter of a share; Edwin Manning and Sheldon Norton one half share; Wright, McDaniel and Darrah one share and three-fourths; Manning and Horn one share; Augustus Gonville one share; Benjamin F. Messenger one share; the heirs of Nathaniel Knapp two shares and seven eighths; Henry Brown one eighth of a share; William, John and Dalzell Smith two and one half shares; William H. Smith two shares; John H. Lines one share; William Price one share; Charles Thompson one share; and one share reserved for Euphrosine Antaya, subject to proof.

The shares of the several petitioners are designated as follows: Josiah Spalding one share and three eighths; Archibald Gamble one share and one eighth; Patrick Walsh one share; Etienne Provost one half share; J. & E. Walsh two shares and seventeen one hundred and twentieths of a share; heirs of Henry K. Ortley two fifths of a share; Green Erskine one share and seventeen twenty fourths of a share; Joseph Ridgway trustee of Geo. Patch

one third of a share; Herman C. Cole one fourth of a share; Stephen Gore one eighth of a share; John B. Sarpy one third of a share; Edmond H. McCabe one third of a share; Hugh Lunutty one share; James R. McDonald one share, Joseph W. Walsh one share; John O. Rourke one half share; Antoine Gracia and Margaret his wife one half share; Angelique La Guthrie, now Mattabon, one half share; Michael Tesson one share; heirs of Otis Reynolds eleven twenty fourths of a share; heirs of James A. H. Palmer one third of a share; Geo. H. Crosman five sixths of a share; and Antoine Le Claire six shares and three eighths of a share.